UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
MARTIN TRETOLA, MARBLES ENTERPRISES,
INC. d/b/a T&T GUNNERY,                    MEMORANDUM AND ORDER
                                           08-CV-3225 (DRH)(WDW)
                Plaintiffs,

        -against-

COUNTY OF SUFFOLK, POLICE OFFICER
FALTINGS,

                Defendants.
------------------------------------X
A P P E A R A N C E S:

For Plaintiffs:

      Friedman, Harfenist, Kraut
      & Perlstein LLP
      3000 Marcus Avenue
      Suite 2E1
      Lake Success, New York 11042
        By: Charles H. Horn, Esq.
            Steven J. Harfenist, Esq.

For Defendants:
      Nassau County Attorney's Office
      One West Street
      Mineola, New York 11501
        By: Joseph Nocella, Esq.
            Ralph J. Reissman, Esq.

HURLEY, Senior District Judge

        Martin Tretola, Marbles Enterprises, Inc. d/b/a T&T

Gunnery, brought suit against the County of Nassau and "Police

Officer Faltings," alleging that he was falsely arrested for

reckless endangerment on June 1, 2007 and was thereafter

maliciously prosecuted for that purported offense.[1]   The case

_____

      [1]  The amended complaint filed on December 2, 2011 contained
a number of additional claims asserted against both the County of
Nassau as well as the individual officer.  However, for reasons

was tried before a jury over a period of six days in August of
2012, at the conclusion of which the jury returned a verdict in
plaintiffs' favor for $5,000,000, consisting of $2,000,000 in
compensatory damages and $3,000,000 in punitive damages.

Presently before the Court is defendants' motion, made
pursuant to Fed. R. Civ. P. 50(b), seeking a vacatur of that
judgment in toto as a matter of law or, in the alternative, for
either a new trial pursuant to Rule 59 or a conditional order of
remittitur to reduce as excessive the compensatory and punitive
damage awards.  For the reasons set forth below, defendants' Rule
50(b) and Rule 59 motions are denied.  However, the application
for a conditional order of remittitur is granted.

<u>BACKGROUND</u>

Martin Tretola ("plaintiff" or "Tretola")[2] is the owner
and operator of Marbles Enterprises, Inc. d/b/a T&T Gunnery ("T&T
Gunnery") which is in the business of selling and repairing
firearms.  It has two places of business, one being in Seaford
and the other in Garden City, both in Nassau County, New York.
Given the nature of T&T Gunnery's business, its stores are

---

not presently germane, only the two above listed causes of action
were pursued by plaintiffs and submitted to the jury.  Tr. at
218.

[2]  Although both Tretola and Marbles Enterprises, Inc. are
listed in the caption as plaintiffs, I will use the singular term
"plaintiff" henceforth throughout this decision referring to
Tretola for simplicity sake since he, as distinct from the
corporation, is the primary aggrieved party.

subject to unannounced inspections being conducted by, inter
alia, members of the Pistol Licensing Bureau of the Nassau County
Police Department.  Tr. at 136.

I.  Facts Pertaining to Tretola's Arrest for Reckless
    Endangerment

        "Police Officer Faltings," whose first name is Eric,
(hereinafter "Faltings"), is a Nassau County police officer,
assigned to the Pistol Licensing Bureau.  On May 9, 2007
Faltings, as well as representatives from (a) the Nassau County
Fire Marshal's Office, (b) the Federal Bureau of Alcohol Firearms
and Tobacco ("ATF"), (c) the Hempstead Building Department and
(d) the Nassau County Bomb Squad conducted a joint inspection of
T&T Gunnery's Seaford facility.  As a result of that inspection,
a number of summonses were issued including one by Fire Marshal
Szymanski charging Marbles Enterprises, Inc. with having
"Numerous Portable Fire Extinguishers Throughout the Premises
That Have not Been Serviced as Required."  (Defs.' Ex. A at 3.)
Marble Enterprises, Inc. pled guilty to a lesser included offense
in the Hempstead District Court of Nassau County on June 26,
2007.  (Defs.' Ex. B.)  The disposition of the other summons
issued on May 9th is unclear.

        Principal among the observations made by Faltings on
May 9th was the location of what appeared to be a gas heater –
seemingly fueled by an active gas line – in close proximity and

on the same wall as two "bullet traps"[3] with surrounding
indentations evidencing "bullet strikes." Tr. at 172. Faltings
perceived that combination as "an extremely hazardous condition."
Id. at 170. Based on that perception, considered in conjunction
with Tretola's acknowledgment that he used the bullet traps in
operating his business, id. at 179-81, Faltings believed he had
probable cause to arrest plaintiff for reckless endangerment in
the first degree in violation of New York Penal Law Section
120.25.[4] For some unexplained reason, the arrest was not made on
the date of the inspection, i.e. May 9th, but rather three weeks
thereafter on June 1st.

       In making the arrest, Faltings assumed that the gas
heater was operational. Tr. at 178-79. In fact, it was not. It
had been disconnected from the outside gas meter more than a
decade earlier. Tr. at 229. That fact, however, was not
communicated verbally or otherwise to Faltings on or before May
9, 2007.

       As to the period from the May 9th inspection to the
June 1st arrest, defendants state that "there was never any

_____

       [3] As explained by Tretola, a bullet trap is "about 16
inches square" and is used primarily "to shoot shotgun[s] and . .
. handgun[s] into" it for test firing purposes. Tr. at 313-14.

       [4] New York Penal Law § 120.25 provides: "A person is guilty
of reckless endangerment in the first degree when, under
circumstances evincing a depraved indifference to human life, he
recklessly engages in conduct which creates a grave risk of death
to another person."

testimony at trial that Faltings was ever made aware [during that time frame] that the gas line may have been inactive, if indeed it was." (Defs.' Mem. in Supp. at 12.) However that statement, although not controverted by plaintiff, is incorrect. Tretola testified that when he was contacted while upstate by Faltings after May 9th and told to return to Nassau County by June 1st so that he could be arrested for reckless endangerment, plaintiff stated, albeit cryptically and to no avail, that the contemplated charge was bogus since "there is no gas in the pipe." Tr. at 353-54. Be that as it may, however, Faltings, based on his observations of May 9th at T&T Gunnery, arranged for Tretola to be arrested at the Seventh Precinct on that June 1st date absent any effort on his part to determine the validity of Tretola's assertion about the operational status of the heater.

The core of the background information thus far recited is largely undisputed. The same may not be said of the events triggering the May 9, 2007 multiple agency inspections.

Defendants produced evidence suggesting that (1) law enforcement's focus on T&T Gunnery started with Detective Loretta Brennan's ("Brennan") inspection of the business's "second hand dealers book" on April 10, 2007 during which she discovered certain bookkeeping errors regarding two weapons that Tretola had not "put into his long gun book" id. at 709; (2) since the "long gun book is what pistol licensing checks," id., she provided

"Officer Leahy" of the Pistol Licensing Bureau with "a copy of
the pages of the secondhand book where [she] found the two
purchases that weren't in the long gun book" id. at 710; (3)
Detective Kevin Haig ("Haig"), then "a supervisor in pistol
licensing" remembered Faltings receiving the materials from
Brennan, rather than Officer Leahy; in any event, Haig testified
that he, not Faltings, was primarily responsible for the May 9,
2007 inspections at T&T Gunnery.  Id. at 734-38.

Plaintiff's view of the evidence and corresponding
arguments to the jury painted a totally different picture with
Faltings orchestrating the May 9th "raid" with the overriding
purpose  being, pure and simple, to punish Tretola.  And "raid,"
construing the evidence most favorably to plaintiff, is an apt
term.  As explained by Hank Brehl ("Brehl"), Tretola's landlord,
the "whole street" upon which T&T Gunnery fronted was cordoned
off and "there were all sorts of agencies going into the store."
Tr. at 234.  The scene was one of "[c]haos" with "ATF", "DEC" and
"the building department" among the multiple agencies on hand.
Id. at 235.  "[E]veryone," Brehl opined, "was following it on the
news.  It was kind of a big happening."  Id. at 237.

Ample evidence is in the trial record to support
plaintiff's view, beginning with a heated verbal exchange between
Tretola and Faltings said to have occurred in "late 2006."  Tr.
at 330.  At that time, Faltings asked Tretola to condense the

-6-

paperwork in a particular case by eliminating one step in the process that Tretola believed was legally required for an out-of-state permit holder to possess a weapon in New York State.  Id. at 330-32.  Faltings felt that Tretola's position was unsound, id. at 99, but rather than arguing the point further, he gave Tretola "permission" to proceed absent the document which was the subject of the dispute, a so-called "purchase document."  Id. at 332.  Tretola refused to do so unless furnished with written authorization, which Faltings declined to provide.  In the end, Tretola's understanding of the necessary procedure was implemented by the out-of-state gun owner and the matter seemingly concluded.  Id. at 99-100.  However, such was not the case.

Afer Tretola spoke to Faltings, Faltings understood that Tretola told a T&T Gunnery employee that Faltings, in effect, did not know what he was talking about and was a "fucking asshole."  Tr. at 103.  That employee inexplicably relayed Tretola's assessment to Faltings.  Id.

Several months later, sometime in "February 2007," Tretola had occasion to be in the public area of the "pistol licensing section" of the police department.  Id. at 183. Faltings, upon spotting Tretola, called him into a different section of the office, whereupon he pronounced "you will not refer to me as a fucking asshole or anybody else in this office

-7-

as a fucking asshole.  Am I making myself perfectly clear?"  Id.
at 125-126.  Such utterances and conduct, Faltings explained
would "not be tolerated."  Id. at 126.  Indeed, at trial,
Faltings characterized his February 7th conversation with Tretola
as an "admonish[ment]," much like he had given to "many other
licensees" previously.  Id. at 130.

        Less than two months after Faltings took it upon
himself to scold Tretola, Officer Brennan checked T&T Gunnery's
records as previously explained.  Although she took no immediate
action herself in response to the irregularity encountered, she
relayed the information to the pistol licensing section.  That
event, plaintiff posits, was the catalyst that permitted Faltings
to severely punish Tretola for his temerity in (1) vociferously
refusing to consummate a gun transaction absent a required
purchase document and (2) in thereafter challenging the officer's
competence.

        Faltings's conduct at T&T Gunnery on May 9, 2007 cannot
be written-off as all in a days work.  From the time he started
in pistol licensing in "January of 2001," Tr. at 82, through to
the time of his deposition in this case, to wit October 28, 2009,
Faltings had made only one arrest, that being the arrest of
Tretola on June 1, 2007.  Id. at 164-65.  He had, of course,
conducted a number of inventory inspections of licensed premises
over the years.  But in none of those did he ask members of ATF

-8-

or of the local building department to join him in a joint
inspection as he did here.  Id. at 150-52.  In fact, it appears
that the intensity and scope of May 9th inspections were
unprecedented in Faltings's experience as a member of the pistol
licensing section.

II.  Facts Pertaining to Tretola's Malicious Prosecution Claim

Who arranged for the May 9th inspections at T&T Gunnery
was disputed at trial.  The thrust of Haig's testimony was that
he, as a supervisor in the pistol licensing section, was
responsible.  However, there was abundant evidence as earlier
outlined, demonstrating that the May 9th inspections were
attributable, in least in significant part if not totally, to
Faltings.

It is undisputed that Faltings was the "arresting
officer" for, as he explained, he signed the June 1, 2012 felony
complaint and swore to its accuracy.  Tr. at 164; see also Tr. at
131.  Faltings also took it upon himself to direct Tretola to
return to Nassau County from upstate New York for purpose of
being arrested at 7:00 a.m. on June 1st at the Seventh Precinct.
Tr. at 353-54.

At this point and against the above background
information, attention will now be directed to the legal
standards governing the relief sought by defendants, followed by
statements of the parties' respective positions and the Court's

analysis of those position.

DISCUSSION

I.   <u>Legal Standards</u>

    A.   <u>Motion for Judgment as a Matter of Law – Rule 50(b)</u>

"The standard governing motions for judgment as a matter of law [ ] pursuant to Rule 50 [of the Federal Rules of Civil Procedure], formerly denominated motions for directed verdict or motions for judgment notwithstanding the verdict, is well established." <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d Cir. 1998)(internal citation omitted). A Rule 50 motion "'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [him].'" <u>Kinneary v. City of New York</u>, 601 F.3d 151, 155 (2d Cir. 2010)(alterations in original)(quoting <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 133 (2d Cir. 2008)). In considering the motion, "[a] court 'must give deference to all credibility determinations and reasonable inferences of the jury,' and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." <u>Caruolo v. John Crane, Inc.</u>, 226 F.3d 46, 51 (2d Cir. 2000)(quoting <u>Galdieri-Ambrosini</u>, 136 F.3d at 289; <u>see also</u>

-10-

This is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)(The issue on a Rule 50 motion is whether "'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'")(quoting Cruz v. Local Union No. 3, Int'l Bd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994)).

    B.   Motion for a New Trial – Rule 59

    A "motion for a new trial 'ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Patrolmen's Benevolent Ass'n of City of New York v. City of New York, 310 F.3d 43, 54 (2d Cir. 2002) (quoting Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998)). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." Id. at 134; accord Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003). On a motion for a new trial pursuant to Rule 59, a court may weigh the evidence and need not view the evidence in a light most favorable to the party that prevailed at trial. See Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992).

Indeed, "the district court is permitted to 'examine the evidence through its own eyes.'" <u>Green v. City of New York</u>, 359 Fed. App'x 197, 199 (2d Cir. 2009) (summary order) (quoting <u>Meloff v. New York Life Ins. Co.</u>, 240 F.3d 138, 147 (2d Cir. 2001)).  "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious.  Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." <u>DLC Mgmt.</u>, 163 F.3d at 134 (internal quotation marks and citations omitted).

II.  Listing (With Analyses to be Provided, <u>Infra</u>)
     of Parties' Arguments Regarding Jury's Liability
     <u>Determinations</u>

     A.  <u>Defendants' Arguments as Movant</u>

          In seeking relief from the jury's liability finding, defendants advance two alternative arguments with respect to the false arrest claim: (1) Tretola's June 26, 2007 plea of guilty to a lesser included offense under the Fire Code appearance ticket issued to Marbles Enterprises, Inc. by Fire Marshal Szymanski on May 9, 2007 provides probable cause for the reckless endangerment arrest ("First Argument"), and (2) the bullet strikes on the wall near what appeared to be a gas-fired heater and accompanying fuel line also provided probable cause for that arrest ("Second Argument").  Should the Court conclude otherwise, arguable probable cause existed to arrest Tretola thereby, defendants

-12-

argue, insulating Faltings from personal liability under the federal causes of action.

      With respect to the malicious prosecution claim, defendants contend "that the District Attorney's Office, not Faltings, determined to prosecute, and continued to prosecute, Tretola after the arrest on June 1, 2007."  (Defs.' Mem. at 17.)

   B. Plaintiff's Arguments in Opposition

      Plaintiff contests the substance of defendants' First Argument regarding the false arrest claim on several disjunctive grounds, including that the corporation Marbles Enterprises, Inc. was the sole named defendant in People v. Marbles Enterprises, Inc., and, accordingly, its plea to the charge does not represent an admission by the plaintiff Tretola.  That ground, as discussed infra, is dispositive of the issue thereby rendering plaintiff's alternate arguments academic.

      With respect to defendants' Second Argument directed at plaintiff's false arrest claim, plaintiff contends that defendants' probable cause argument concerning the reckless endangerment arrest is flawed because (1) it fails to address the elements of the crime charged including its mens rea requirement, (2) absent from the record is evidence indicating that Tretola discharged firearms in close proximity to the perceived gas meter and gas lines, (3) allowing others to utilize a firearm testing facility does not permit a reckless endangerment charge being

-13-

leveled against the owner or operator of the facility, and (4) the reckless endangerment charge was fatally flawed from the outset due to "factual impossibility" attributable to the absence of gas in the lines.

In addition to the just listed arguments highlighted in plaintiff's post-trial Memorandum of Law in Opposition, plaintiff, in opposing defendants' Rule 50(a) motion at trial, articulated the position that it was for the jury to decide whether a reasonable police officer would have endeavored to determine whether there was gas in the lines as part of the probable cause assessment instead of arresting plaintiff without such further investigation.  As will be explained _infra_, the answer to this last question is pivotal to a resolution of the present dispute particularly with respect to the legitimacy of the jury's false arrest determination.

Plaintiff's position concerning the availability of qualified immunity vis-a-vis Faltings's involvement in Tretola's false arrest is essentially as follows: (1) the defense is procedurally barred for failure to be advanced as part of defendants' Rule 50(a) motion at trial, and (2) in any event, he has failed to demonstrate an entitlement to such protection even if the claim is addressed on its merits.

Finally, as to the malicious prosecution claim, plaintiff underscores that "Tretola was arrested on June 1, 2007

-14-

based on Faltings [sic] actions" and thereafter was "prosecuted

by the Nassau County District Attorney with significant

assistance from Faltings."  (Pl.'s Mem. in Opp'n at 14-15.)

### III. The Guilty Plea of Marble Enterprises, Inc. to a Fire Code Violation Does not Provide Probable Cause for the Arrest of Tretola on June 1st for Reckless Endangerment as Urged by Defendants in Their First Argument Directed to the False Arrest Verdict

"An officer has probable cause to arrest when he or she

has 'knowledge or reasonably trustworthy information of facts and

circumstances that are sufficient to warrant a person of

reasonable caution in the belief that the person to be arrested

has committed or is committing a crime.'"  Jaegly v. Coach, 439

F.3d 149, 152 (2d Cir. 2006)(quoting Weyant v. Okst, 101 F.3d

845, 852 (2d Cir. 1996).  The existence of probable cause is a

complete defense to an action for false arrest "whether that

action is brought under state law or under § 1983." Weyant, 101

F.3d at 852.  A party may not legitimately complain if, on the

date of his arrest, the arresting officer or another officer

involved at the scene had probable cause to arrest that party for

any offense.  See Jaegly, 439 F.3d at 154 ("[A] claim for false

arrest turns only on whether probable cause existed to arrest a

defendant, and that it is not relevant whether probable cause

existed with respect to each individual charge, or, indeed, any

charge actually invoked by the arresting officer at the time of

the arrest."); see also Marcavage v. City of New York, 689 F.3d

98, 110 (2d Cir. 2012)("Defendants [will] prevail [on their probable cause to arrest position] if there was probable cause to arrest Plaintiffs for any single offense.").  And a guilty plea, even if to a lesser included offense under a charged violation, is fatal to a false arrest claim.  That is so because such a plea, in essence, bars the supposedly aggrieved party from alleging the absence of sufficient grounds for his or her arrest. In defendants' view, as articulated in their First Argument, Marbles' June 26, 2007 plea to fire code violation eviscerates Tretola's false arrest claim as a matter of law.  That argument lacks merit.

Marbles Enterprises, Inc., was the entity charged in the appearance ticket issued by Fire Marshal Szymanski on May 9th and the corresponding guilty plea was entered by Tretola on behalf of the corporation.  Tretola, of course, was the arrestee on June 1, 2007, not the corporation.  Yet defendants, in their well crafted post-verdict submissions, fail to explain how a corporate plea binds an individual plaintiff.  Perhaps the thought is that their joinder as plaintiffs provides the necessary nexus.  If so, the logic of that possible argument is problematic at best.  Cf. UCAR Intern., Inc. v. Union Carbide Corp., 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004)("A basic tenant of American corporate law is that the corporation and its shareholders are distinct entities")(internal quotation marks and

-16-

citations omitted).

Also unexplained by defendants is the logic behind the proposition that the probable cause for the May 9th fire code violation, with the concomitant issuance of an appearance ticket, furnishes a legally cognizable predicate for Tretola's arrest for reckless endangerment three weeks thereafter.  It is one thing to say that the existence of probable cause for a fire code violation on May 9th may serve as the basis for plaintiff's arrest on that date for reckless endangerment, and something all together different to claim, as defendants implicitly do, that the May 9th probable cause for the fire code violation provides an "open-ended" basis to arrest plaintiff without a warrant and without offense-specific probable cause sometime thereafter. Here the "sometime thereafter" was June 1st, but if defendants' argument is sound the later arrest presumably could have occurred three months thereafter or anytime within the applicable statute of limitations. Not surprisingly, defendants have provided no authority for that notion.

In sum, defendants' argument that Marble Enterprises, Inc.'s guilty plea provided probable cause for Tretola's arrest, presented devoid of authority or a convincing rationale, is unconvincing.

IV.  The Jury's Implicit Finding That Faltings Lacked
     Probable Cause to Arrest Tretola on June 1, 2007
     is Neither Contrary to Applicable Law nor the
     Facts Adduced at Trial

By way of format, initially certain basic principles of probable cause jurisprudence are set forth in this segment of the opinion.  That is followed by an analysis of whether Faltings had probable cause to arrest Tretola, utilizing May 9th as the operative date in keeping with the arguments of both counsel.

After May 9th, however, and shortly before his arrest, Tretola told Faltings, in essence, that the heater was not operational.  But for some unexplained reason that post-May 9th conversation is not mentioned in the parties' post trial submissions.  Possibly that brief but critical portion of the testimony was overlooked, leading to the problematic date selection.  In any event, given the Court's belief that the appropriate date for present purposes was when Tretola was actually arrested on June 1st, defendants' attack on the false arrest verdict is also evaluated under that scenario.

A. Probable Cause is Determined Solely on an Objective
   Basis

Construing all the evidence in the light most favorable to plaintiff, as must be done in a Rule 50 context, Faltings's conduct was outrageous.  For a police officer to utilize the awesome power of arrest for vendetta purposes represents an abhorrent abuse of the public trust.  That point was driven home repeatedly by plaintiff's counsel throughout the trial.  However, Faltings's motivation is not germane in assessing the presence or absence of probable cause.  As explained by the Supreme Court in

-18-

<u>Brigham City, Utah v. Stuart</u>:

> An action is "reasonable" under the Fourth
> Amendment, regardless of the individual
> officer's state of mind, "as long as the
> circumstances viewed <u>objectively</u> justify
> [the] action." <u>Scott v. United States</u>, 436
> U.S. 128, 138 (1978)(emphasis added).  The
> officer's subjective motivation is
> irrelevant.  <u>See</u> <u>Bond v. United States</u>, 529
> U.S. 334, 338 n.2 (2000)("The parties
> properly agree that the subjective intent of
> the law enforcement officer is irrelevant in
> determining whether that officer's actions
> violate the Fourth Amendment . . .; the issue
> is not his state of mind, but the objective
> effect of his actions."); <u>Whren v. United
> States</u>, 517 U.S. 806, 813 (1996)("[W]e have
> been unwilling to entertain Fourth Amendment
> challenges based on the actual motivations of
> individual officers."); <u>Graham v. Connor</u>, 490
> U.S. 386, 397 (1989)("[O]ur prior cases make
> clear" that "the subjective motivations of
> the individual officers . . . ha[ve] no
> bearing on whether a particular seizure is
> 'unreasonable' under the Fourth Amendment.).

547 U.S. 398, 404 (2006)(emphasis in original).

For analytical purposes, therefore, Faltings's thought processes must be divorced from the assessment and the focus confined to "whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount[ed] to probable cause." <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1116 (10th Cir. 2007).

B. Faltings's Observations on May 9, 2007 Provided
   Probable Cause to Arrest Tretola for Reckless
   Endangerment as of That Date

On May 9th, Faltings saw what he believed to be a gas-fired heater and accompanying gas lines on the same wall, and in

close proximity to an apparent firing range.  He knew, as earlier
noted, that Tretola was the operator of T&T Gunnery and had
discharged weapons into the bullet traps in the facility.  The
then current and repeated use of those traps for testing and
possibly other purposes was evident from, inter alia, the
hundreds, if not thousands of spent shells on the floor and by
the multiple sets of ear and eye protectors on site.  Tr. at 170-
72.

          Plaintiff argues that those observations were
inadequate to establish probable cause on the several grounds
detailed previously.  But some of those grounds, viz. factual
impossibility and absence of the evidence as to mens rea, are
patently flawed due to their proponent conflating what is
required to establish probable cause and the proof necessary to
convict.  The standards are distinct.  <u>See, e.g.</u>, <u>Draper v.
United States</u>, 358 U.S. 307, 312 (1959)("There is a large
difference between the two things to be proved" [referring to
guilt and probable cause]); <u>Criss v. City of Kent</u>, 867 F.2d 259,
n.1 at 262 (6th Cir. 1988)("The quantum of proof required to
establish probable cause is significantly lower than that
required to establish guilt.  The issue in this case is <u>not</u>
whether sufficient evidence exists to support a conviction for
receipt of stolen property but simply whether the City of Kent
police officers, at the time they arrested the plaintiff, had

probable cause to believe that plaintiff had violated the Ohio
statute (internal citation omitted)(emphasis in original); Cf.
Coogan v. City of Wixom, 820 F.2d 170, 173 (6th Cir. 1987)("the
standard of proof of guilt beyond a reasonable doubt has no
relevance to the issue of probable cause to institute a
prosecution").

Based on Faltings's observations made on May 9th, he
had "knowledge . . . of facts and circumstances . . . sufficient
to warrant a person of reasonable caution in the belief that
[Tretola had] or [was] committing a crime," Jaegly, 439 F.3d at
152.  In urging a contrary result, plaintiff insists that a
precondition to finding probable cause was an investigation to
assure that the heater was operational even though Faltings at
that time had no information to suggest that it was not.
However, common sense suggests that it is reasonable for a person
entering an established place of business to assume that an
apparently intact heating system is operational, just as, for
example, an individual visiting someone's home, absent contrary
evidence, would assume that bathroom fixtures were in working
order.  Incidently, Fire Marshal Szymanski assumed that the gas
heater at T&T Gunnery was operational as of May 9, 2007.  Tr. at
673-74 and 686-89.

To determine whether the heater was connected to an
established gas line would have required the officer to go

outside of T&T Gunnery's premises to inspect the exterior of the outside wall in search of a corresponding gas meter.  Plaintiff's argument that the jury could legitimately conclude that such an additional step was required as of May 9th is not convincing. The jury's role was to determine facts, not alter established law.

Faltings's observations on May 9th, objectively viewed, were not inconclusive or otherwise suspect so as to require that he investigate further before concluding that he had probable cause.  Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001); Krause v. Bennett, 887 F.2d 362, 370-72 (2d Cir. 1989). See Hahn v. County of Otsego, 820 F. Supp. 54, 58-59 (N.D.N.Y. 1993)("The question is not what might have been developed from further investigation, but whether the facts known when, and on which, defendant acted were sufficient to constitute probable cause."); see also Criss, 867 F.2d at 263.  If, contrary to the fact, the situation were otherwise, further investigation – such as taking steps to determine if the heater was actually operational – would have been called for.  See Cortez v. McCauley, 478 F.3d 1108, 1116-17 (10th Cir. 2007)(further investigation required to establish probable cause where "the only information which arguably implicated [the defendant] was [a twice-removed hearsay] statement attributed to a barely-verbal two-year old child that her babysitter's "boyfriend" had "hurt

her pee pee."; <u>Wong v. Yoo</u>, 649 F. Supp. 2d 34, 60-61 (E.D.N.Y.
2009); and <u>Roundtree v. City of New York</u>, 208 A.D. 2d 407, 407
(1st Dep't 1994)("Here, probable cause was lacking, given the
indicia of unreliability in the statement that was undisputedly
the impetus for plaintiff's arrest.  The investigating officer
admitted that he had harbored serious doubts about the witness'
identification of plaintiff as the murderer. . . .").

    Where, as here, the officer had probable cause – or at
least did as to May 9th – no further inquiry or probing was
necessary.  As explained by the Second Circuit in <u>Krause v.
Bennett</u>:

>    It bears repeating that probable cause does
>    not require an officer to be certain that
>    subsequent prosecution of the arrestee will
>    be successful.  "It is therefore of no
>    consequence that a more thorough or more
>    probing investigation might have cast doubt
>    upon" the situation. . . .
>
>    Once officers possess facts sufficient to
>    establish probable cause, they are neither
>    required nor allowed to sit as prosecutor,
>    judge or jury.  Their function is to
>    apprehend those suspected of wrongdoing, and
>    not to finally determine guilt through a
>    weighing of the evidence.

887 F. 2d at 371-72 (quoting <u>Manley</u>, 632 F.2d at 984).

    Simply put, had Faltings arrested Tretola for reckless
endangerment on May 9th, or even thereafter barring a significant
change in circumstances, he would have had probable cause for
that arrest and the jury's verdict could not stand.  But the

arrest did not occur on that date, and the circumstances did change materially before Tretola's arrest on June 1st.

C. Probable Cause for False Arrest Purposes Should be Determined as of the Actual Date of Arrest, Here June 1, 2007

Tretola was arrested on June 1, 2007.  Even though it is not imperative that an arrest be made contemporaneously with the acquisition of probable cause, here the landscape changed materially between May 9th and the arrest date.  That is evidenced by the following collogue between Faltings and Tretola as reported by Tretola during his direct examination by plaintiff's counsel:

Q.  All right.  How did it come about that you were arrested?

A.  Well, I was really, like stressed out, so me and my wife, we took a ride upstate New York.  I like to go upstate to buy tomatoes and stuff.

I got a call from Eric Faltings on my cell phone, and he says, you've got to come down here right now. You're being arrested.

Q.  Do you remember what time it was?

A.  It was Thursday, the day before I got arrested.  I said, I'm all the way upstate New York.  I was all the way by Albany.  I said, it's going to take a long time to get down there.  I said, what am I being arrested for?

-24-

Q.  What did he say?

A.  He said, you're being arrested for reckless endangerment.  I said, what?  He said, gas in the pipe.  I said there is no gas in the pipe.  I said I can't make it down there today.  He says you can report to the Seventh Precinct at seven o'clock in the morning and get arrested.

Q.  Is that what you did?

A.  That's what I did, and I got arrested.

Tr. 353-54.(emphases added).

This additional information must be factored into the probable cause analysis with the relevant date now being June 1, 2007, not May 9, 2007.  Devenbeck v. Alford, 543 U.S. 146, 152 ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.")

Parenthetically, for Faltings to have said "gas in the pipe" as reported by Tretola is arguably out of sync with other evidence in the case since supposedly up to that point Faltings was unaware that there was even a question as to the operability of the heater.  However, for purposes of the present Rule 50(b) motion, all evidence must be construed most favorably to the non-movant.  Although the specifics of the actual exchange between Faltings and Tretola may or may not have dovetailed precisely with the conversation as reported by Tretola, it must be assumed

that Faltings had notice before June 1st of Tretola's easily
variable position, i.e. that, in effect, the heater was not
operational.

     D.  Identification of Pivotal Question as to Jury's
         Verdict on the False Arrest Claim and Denial of
         Defendants' Rule 50(b) Motion to Vacate Jury's
         <u>Liability Determination as to that Cause of Action</u>

       Is there adequate evidence in the record to support the
jury's finding that Faltings falsely arrested Tretola consistent
with the applicable law regarding a police officer's duty to
investigate in certain situations?  That question calls for a two
part analysis: (1) whether there is a factual predicate for the
jury's implicit determination that Faltings, had he acted as a
reasonable police officer, would have called the gas company or
taken some other minimal step to determine the operability of the
heater before arresting Tretola, and (2) if question (1) is
answered in the affirmative, whether the jury's conclusion is
consistent with governing law regarding an officer's obligations
in determining the presence or absence of probable cause.  These
two subsidiary issues shall be addressed in reverse order.

       i)  <u>Applicable Law</u>

       A jury's finding of fact cannot stand if its
application would result in a conclusion which is contrary to
established law.  The case law, cited earlier, indicates that
once an officer has probable cause, there is no need for him or
her to delve deeper before making an arrest.  To do so, would run

afoul of the rule enunciated in such cases as <u>Krause v. Bennett</u>, 887 F.2d 362 (2d Cir. 1989) which, in essence, instruct that it is not a police officer's role before making an arrest to try to resolve disputed issues of fact.  Thus, for example in <u>Curley v. Village of Suffern</u>, 268 F.3d 65 (2d Cir. 2001), the Second Circuit held that the defendant officer had probable cause to arrest a bar owner for assault based on the complaint of a patron who claimed he had been attacked by the owner, and displayed injuries consistent with that report, without investigating the bar owner's contrary version of the event.

However, "probable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat seat of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).  Indeed, the failure to investigate further when a reasonable officer under the circumstances "would have done" so may indicate a "lack of probable cause" under the "totality of circumstances." <u>Manganiello v. City of New York</u>, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks and citations omitted).  "[A] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." <u>BeVier v. Hucal</u>, 806 F.2d 123, 128 (7th Cir. 1986).  The Second Circuit and New

York State courts recognize the importance of investigation and corroboration in appropriate cases.  Wu v. City of New York, 934 F. Supp. 581, 587 (S.D.N.Y. 1996).  See also Lowth v. Town of Cheektowaga, 82 F.3d 563, 570-71 (2d Cir. 1996); Stile v. City of New York, 172 A.D. 2d 743 (2d Dep't 1991); Fausto v. City of New York, 17 A.D. 3d 520 (2d Dep't 2005); Carlton v. Nassau County Police Dept., 306 A.D. 2d 365, 365 ("contrary to the defendant's assertions [in seeking summary judgment], issues of fact exist to whether the police officers had probable cause to arrest plaintiff without a warrant at his home for (theft of services) . . . after the plaintiff left a restaurant without paying disputed portions of the bill, notwithstanding the existence of an affidavit by the restaurant owner that the plaintiff left without paying the bill"); and Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994)(quoting, with approval the following excerpt from BeVier v. Huckle, just cited, for the proposition "reasonable avenues of investigation must be pursued [to establish probable cause] especially when, as here, it is unclear whether a crime had even taken place.").

Simply citing, as defendants have, the cases in the Second Circuit which stand for the general proposition that once probable cause is found to exist no further investigation is required, is not dispositive of the matter at hand.  Rather the relevant question is whether, given the totality of

-28-

circumstances, Faltings should have investigated further <u>before</u> concluding that he had probable cause to arrest as of June 1st. Included within the "totality of circumstances" is the de minimus effort that would have been required to answer the simple question of whether the heater was, or was not connected to a gas line on May 9th.  And that effort, unlike the scenario in <u>Krause</u> and <u>Curley</u>, would not have entailed evaluating conflicting reports implicating credibility determinations.

In sum, the jury was called upon to determine a number of factual issues, one of which was whether a reasonable police officer in Faltings's position, <u>once told of the heater's purported status</u>, would have ignored the information as Faltings did or, conversely, would have done something to clarify the situation before subjecting Tretola to a felony arrest. Presenting that question to the jury was consistent with both the Court's charge[5] and relevant case law.  What remains to be determined is whether their answer – which must be viewed in the present Rule 50(b) context to have been in the affirmative – finds factual support in the record.

      ii)   Jury's Determination That Faltings
             did not Have Probable Cause
             on June 1, 2007 to Arrest Tretola,

---

[5]  The jury in <u>Tretola</u> was instructed that "an officer's failure to investigate an arrestee's protestations of innocence will not negate the existence of probable cause <u>unless</u> the reasonable officer under the then present circumstances would have investigated further."  Tr. 940 (emphasis added).

-29-

> Presumably Because he Turned a
> "Deaf Ear" to Tretola's Statement
> About the Inoperability of the Heater,
> <u>has Abundant Support in the Record</u>

In the "BACKGROUND" section of this decision <u>supra</u>, the details of Tretola's arrest for Reckless Endangerment, and the relevant events preceding that arrest, are provided.  Included within that recitation are facts which support the proposition that a reasonable officer would have checked to see if the heater was operational once receiving pre-arrest notice that it might not be.  The jury knew that time was not of the essence since Faltings waited three weeks after May 9th to effectuate the arrest.  And they knew that "seven or eight days before [Tretola's arrest]," Tr. at 352, the "fire marshal" visited the premises and, upon being told by Tretola that the "gas heater wasn't operational," quickly verified that fact by "walk[ing] to the back of the store" with Tretola and seeing that "the box [i.e. gas meter] was disconnected."  Tr. 351-62.  As a result, tickets issued by fire marshal on May 9th related to the heater were withdrawn on the spot.  And, of course, the jury had heard about Christophe's call to the gas company verifying that the gas line had been long since disconnected.  And perhaps the jury was concerned about Faltings's failure to even discuss the operability of the heater with Tretola on May 9th or thereafter. Had he done so, that presumably would, and certainly should have been the end of the matter.

-30-

In sum, there was more than adequate evidence in the record to support the jury's verdict as to the false arrest claim when that claim is viewed as of June 1st instead of May 9th.[6] Accordingly the defendants' argument that that verdict must be vacated is unavailing.

At this point, attention will be directed to the jury's verdict of liability vis-a-vis plaintiff's malicious prosecution claim.

V.   Defendants' Rule 50(b) Motion to Vacate the Jury's Liability Determination on the Malicious Prosecution Claim is Denied

A.   Elements of Malicious Prosecution Claim, Focusing Primarily on the Vigorously Disputed First Element

"To sustain a claim under . . . § 1983 based on malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." Alcantra v. City of New York, 646 F. Supp. 2d 449, 457 (S.D.N.Y. 2009).

The elements of the New York State tort of malicious prosecution are "(1) the initiation or continuation of a criminal proceeding against plaintiff [by the defendant or defendants as the case may be]; (2) termination of the proceeding in

_____

[6]   The only disputed element of the false arrest cause of action was whether the subject arrest was based on probable cause.

plaintiff's favor; (3) lack of probable cause for commencing [or continuing] the proceeding; and (4) actual malice as a motivation for defendant's actions." Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995). Since the four elements are in the conjunctive, the failure to establish any one of the four is fatal to the plaintiff's claim.

As to the first element, "[t]here is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding." Crenshaw v. City of Mount Vernon, 2008 WL 4452223, at *8 (S.D.N.Y. Sept. 30, 2008), rev'd in part on other grounds, 372 Fed. App'x 202 (2d Cir. 2010). Notwithstanding that presumption, a plaintiff may still establish the first element of the cause of action by "demonstrating that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Espada v. Schneider, 522 F. Supp. 2d 544, 553 (S.D.N.Y. 2007)(internal citations and quotation marks omitted).

Judge Sand in Cunningham v. New York City, provided the following overview of the specific types of conduct by police officers in the Second Circuit which has been found sufficient to satisfy the first element:

> In malicious prosecution cases against police
> officers, plaintiffs have met this first
> element [of initiation of prosecution] by
> showing that officers brought formal charges

-32-

and had the person arraigned, <u>Cook v.
Sheldon</u>, 41 F.3d 73, 79 (2d Cir. 1994), or
filled out complaining and corroborating
affidavits, <u>Carter v. Port Auth. of New York
& New Jersey</u>, 2004 WL 2978282, at *8 (S.D.N.Y
Dec. 20, 2004), or swore to and signed a
felony complaint.  <u>Cox v. County of Suffolk</u>,
827 F. Supp. 935, 938 (E.D.N.Y. 1993)."
<u>Llerando-Phipps v. City of New York</u>, 390 F.
Supp. 2d 372, 382-83 (S.D.N.Y. 2005); <u>see
also</u> <u>Cook v. Sheldon</u>, 41 F. 3d 73, 79 (2d
Cir. 1995).

2007 WL 2743580, at *5 (S.D.N.Y.).

Moreover, given the difficulty in "divining the
influence of an investigator or other law enforcement officer
upon the prosecutor's mind," the trier of fact may consider
whether the subject arrest was predicated upon the presence or
absence of probable cause.  <u>Hartman v. Moore</u>, 547 U.S. 250, 263
(2006).

B.   Question Presented and Faltings's Role
     <u>in the Prosecution</u>

Is there sufficient evidence in the record, construed
most favorably to Tretola, to support the jury's finding on his
malicious prosecution claim consistent with applicable law?
Specifically, did Faltings play "an active role in the
prosecution"?  <u>Rohman v. New York City Transit Auth.</u>, 215 F.3d
208, 217 (2d Cir. 2000).  The simple answer is "Yes."

Faltings's role in the prosecution is detailed in
Section II of the <u>BACKGROUND</u> portion of this opinion, entitled
"Facts Pertaining to Tretola'a Malicious Prosecution Claim"

-33-

supra.  By way of a brief synopsis, and construing all the
evidence most favorably to Tretola, Faltings (1) played a
significant role in the May 9, 2007 multi-agency inspections (2)
was the self-admitted arresting officer who signed the June 1,
2007 complaint and swore to its accuracy (3) personally arranged
for Tretola to surrender at a particular time and location so his
arrest could be consummated and (4) never mentioning to Pincus or
Christophe that Tretola maintained that the system was not
operational.  That level of involvement is sufficient to
establish the first element of Tretola's malicious prosecution
claim.  See, e.g., Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir.
1994)("The Troopers commenced a criminal proceeding against him
by formally charging Cook with violating the VIN statute and
having him arraigned before the town justice."); Carter, 2004 WL
2978282, at *8 ("Here, it is clear that the defendants . . .
initiated and continued criminal process against Carter by
swearing out the complaining and corroborating affidavits to
initiated [sic] the case and being available as witnesses to
continue the case.); and Cox v. County of Suffolk, 827 F. Supp.
935, 938 (E.D.N.Y. 1993)("[W]hen police officer Ingald swore to
and subscribed a felony complaint charging Plaintiff with sodomy
in the first degree, Defendants continued a criminal proceeding
against Plaintiff.").

        Defendants, in urging a contrary conclusion, maintain

-34-

that assistants in the District Attorneys Office, not Faltings, made the decision to prosecute. (Defs.' Mem. in Supp at 17.) In doing so, considerable reliance was placed on the testimony of Kelly Pincus ("Pincus"), an assistant district attorney assigned to the Early Case Assessment Bureau. Id. at 17-18. However, Pincus's role in that Bureau was solely to review complaints as prepared by the arresting officers to assure that the documents covered each of the elements of the crimes charged. She explained that if "we took in over the course of five years 60,000 cases, there's probably been six, if that many, that we've actually said when we reviewed the paper work, no, we're not going to go forward with an arraignment on this." Tr. at 519. The role of the Bureau assistants, contrary to argument advanced by defendants, was not to decide whether to prosecute following an arrest or, at least, the jury could have reasonably so concluded. Instead, their function was limited to reviewing the facial sufficiency of charging documents presented by arresting officers.

The only other representative from the District Attorneys Office who testified was Cliff Christophe ("Christophe"). He testified that he inherited the Tretola file from two other assistant district attorneys in the Office, Tr. at 544, in or about November of 2007. Id. at 543. At some point, Christophe learned – after, inter alia, contacting the gas

company – that no crime had been committed because the heater was
not operational.  Accordingly, Christophe wrote two dismissal
memoranda to his supervisor, recommending dismissal of the case,
id. at 612, which ultimately occurred on February 27, 2008, Joint
Pretrial Order, ¶ 11 at p. 7, on speedy trial grounds.  Tr. at
585.  While Christophe was handling the case he made several
unsuccessful efforts to contact Faltings who failed to return his
phone calls, Tr. at 572, although they did get together on three
occasions.  On each of those occasions, however, the sole subject
discussed pertained to police photographs of the bullet trap
area.  Tr. at 560-61.

C.  Jury's Determination as to Malicious Prosecution
    Claim is Consistent With the Law and Facts

As just noted, ample evidence exists demonstrating that
Faltings played a significant role in the prosecution of Tretola
thus satisfying the first element of plaintiff's malicious
prosecution claim.  The second element, viz. a favorable
determination, is not in dispute.  Plaintiff has also
demonstrated the absence of probable cause for his reckless
endangerment arrest and, in the process under the attendant
circumstances here, satisfied the third element of his malicious
prosecution claim.

As to the fourth or final element, defendants contend
that the record is devoid of sufficient evidence of malice.  But,
as earlier noted, the Supreme Court in Hartman v. Moore instructs

-36-

that the absence of probable cause may be an indicia of malice.

Beyond that, however, the record is replete with evidence that

this entire troubling episode is traceable to animosity harbored

by Faltings towards Tretola.  Indeed, the presence of malice is

virtually undisputable given that the evidence must be viewed in

the context of the present Rule 50(b) motion.

For the reasons indicated, defendants' motion to vacate

the jury's malicious prosecution verdict is denied.

VI.  Defendants' Qualified Immunity Claim is Procedurally Barred

A.  Applicable Law

The following excerpt from the Second Circuit decision

in Ricciuti v. N.Y.C. Transit Authority provides the following

overview of qualified immunity:

> The doctrine of qualified or good faith
> immunity shields police officers from being
> subject to personal liability for damages.
> The doctrine extends to official conduct that
> does not violate clearly established
> statutory or constitutional rights of which a
> reasonable person would have known, insofar
> as it was objectively reasonable for such
> officials to believe, even if mistakenly,
> that their conduct did not violate such
> rights.
>
> The right to be free from arrest or
> prosecution in the absence of probable cause
> is a long established constitutional right.
> A police officer is entitled to qualified
> immunity shielding him or her from a claim
> for damages for false arrest where (1) it was
> objectively reasonable for the officer to
> believe there was probable cause to make the
> arrest, or (2) reasonably competent police
> officers could disagree as to whether there

was probable cause to arrest.

124 F.3d 123, 129-128 (2d Cir. 1997)(internal citations and

quotation marks omitted).

    B.  Requirement That a Request for Judgment as a
       Matter of Law ("JMOL") Pursuant to Rule 50(b)
       Must be Based on a Ground Articulated by the
       <u>Movant During the Trial Under Rule 50(a)</u>

Defendants seek a determination in their Rule 50(b)

motion "that even if probable cause did not exist to arrest

Tretola, Faltings is still protected from liability since he is

entitled to qualified immunity, based on arguable probable

cause." (Defs.' Reply at 9.) Plaintiff contends defendants'

request is procedurally barred in that "[a]t no time during the

trial of this matter did the defendant ever argue the defense of

qualified immunity in a FRCP 50(b) motion." (Pl.'s Mem. in Opp'n

at 19.) In response, defendants maintain:

> Plaintiffs argue that defendants waived the
> right to assert this defense in this 50(b)
> motion since it was not explicitly stated in
> defendants' 50(a) motion. Pl. Mem., pp. 18-
> 20, citing <u>Lore [v. City of Syracuse</u>, 670
> F.3d 127 (2d Cir. 2012)]. Plaintiffs are
> wrong. In <u>Lore</u>, the Second Circuit expressly
> held that the issue of qualified immunity is
> a legal issue to be determined by the court,
> not by the jury. <u>Lore</u>, 670 F.3d at 162 ("We
> conclude that although the district court
> properly put the fact questions to the jury,
> it erred in having the jury decide the
> ultimate legal question, in light of the
> facts established of whether [defendant
> police officer] in his personal capacity, was
> entitled to qualified immunity. <u>That legal</u>
> <u>question should have been answered by the</u>
> <u>court</u>.") (emphasis added.) Therefore, it was

-38-

> not necessary that defendants present the
> issue of qualified immunity at the close of
> plaintiffs' case or, indeed, at the close of
> trial.  Moreover, at the close of plaintiffs'
> case, the Court asked Deputy County Attorney
> Joseph Nocella, "Mr. Nocella, are there any
> motions now that the plaintiff has –
> plaintiffs have presented their case-in-
> chief?"  Tr. 690:23-691:1.  Nocella then
> moved for a directed verdict, stating
> "there's insufficient evidence for any
> reasonable jury to find that the defendants
> lacked probable cause[.]" Tr. 691:2-7.  It is
> implicit in Nocella's reference to "probable
> cause" that <u>arguable</u> probable cause, which is
> required to establish qualified immunity, was
> included in his 50(a) motion at the close of
> plaintiffs' case, as well as his renewed
> 50(a) motion at the close of trial.  Tr.
> 983:23-984:24.

(Defs.' Reply at 9-10.)

Plaintiff has the better side of the argument.  <u>Lore</u>
does not provide support for the position that "it was not
necessary that defendants present the issue of qualified immunity
at the close of plaintiffs' case or, indeed, at the close of
trial." (Defs.' Reply at 10.)  Granted, the "ultimate legal
question" as to whether Faltings was entitled to qualified
immunity would have been for the Court to decide had the subject,
contrary to the fact, been broached by Faltings during the trial.
However, the task of making the predicate factual findings rests
with the trier of fact.  Yet, defendants did not request special
interrogatories to elicit factual finding from the jury.  <u>Lore</u>,
670 F.3d at 162; <u>see generally</u> <u>Matthews v. City of New York</u>, 2006
WL 842392, at 8, n.3 (E.D.N.Y. Mar. 27, 2006).

-39-

Conceivably an argument could be advanced that there were no factual issues bearing on the availability of qualified immunity raised during the trial thereby obviating the need for jury input and placing the issue squarely in the Court's hands. However, the defense has not taken that position, and the Court is unaware of any case law in a Rule 50(b) context, suggesting that such an argument would be anything other than problematic. Moreover, plaintiff, in his post verdict submission has identified a number of questions which he believes should have been presented to the jury via interrogatories had Faltings elected to pursue his qualified immunity defense. (Pl.'s Mem. in Opp'n at 20, n.13 ("Towards the close of trial, the Court unilaterally raised the issue of qualified immunity and offered the Defendants the option to propose interrogatories which would allow the Court to reach the issue of qualified immunity. Tr. at 807-808. These interrogatories could have asked the jury, for example, if the marks Faltings saw on the wall were bullet holes or whether evidence existed that the pipe was a gas line. However, the Defendants never followed the Court's direction in this regard.").)  Absent from defendants' reply memorandum is a comment, no less a specific retort, to Tretola's proffered "additional procedural hurdle" to their current qualified immunity argument, viz. "the failure to submit any interrogatories to the jury." (Pl.'s Mem. in Opp'n at 19.)

Simply put, Lore does not support defendants' Rule 50(b) argument that Faltings is entitled to judgment as a matter of law under the doctrine of qualified immunity even though that ground was never mentioned in defendants' Rule 50(a) applications.

Similarly unavailing is the alternative argument that defense counsel's incantation of the term "probable cause" during his Rule 50(a) applications "implicit[ly]" provided the requisite notice to opposing counsel and the Court of Faltings's qualified immunity claim for purposes of Rule 50(b).  (Defs.' Reply at 10.) As to that issue, Lore is instructive.  In Lore, the Second Circuit explicitly underscores that, to provide "fair" notice to the non-movant under Rule 50(a), "'the motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.'" Lore, 670 F.3d at 152 (quoting the statutory text of Fed. R. Civ. P. 50(a)(2))(emphasis omitted).  An oblique reference to "probable cause" fails to satisfy that standard. And "the specificity requirement is obligatory".  Holmes v. United States, 85 F.3d 956, 962 (2d Cir. 1996)(internal quotation marks and citations omitted).

C.  Conclusion as to Qualified Immunity Defense

For the reasons indicated, the captioned portion of defendant's Rule 50(b) motion is denied as procedurally barred.

VII. Defendant's Motion for new Trial Pursuant to
     Rule 59(a) is Denied but Their Alternate Motion for

-41-

Remittitur of Both the Compensatory and Punitive
Damage Awards is Granted

Defendants have moved pursuant to Rule 59(a) of the
Federal Rules of Civil Procedure for a new trial should the
Court, as it has, deny their Rule 50(b) motion, or, in the
alternative, for a remittitur of both the compensatory and
punitive damage awards.

In seeking a new trial defendants contend that "since
probable cause existed for Faltings to arrest Tretola, based
[not] only on [applicable case law], but also because probable
cause, or at least arguable cause, existed, the jury's findings
of false arrest and malicious prosecution are against the clear
weight of evidence."  (Defs.' Mem. in Supp. at 20.)  Given that
the identified linchpins for that position are the purported
presence of probable cause or arguable probable cause, the
Court's previously announced contrary findings on those subjects
is fatal.  For that reason and others, the jury did not reach a
"seriously erroneous result" nor may its findings of liability be
legitimately labeled as "a miscarriage of justice."  Patrolmen's
Benefit Ass'n of City of New York, 310 F.3d at 54.  However,
although defendants are not entitled to a new trial, their
position as to the need to downwardly adjust the jury's monetary
awards via remittitur has merit.

VIII.  Conditional Remittitur is Warranted as to Jury's
Compensatory and Punitive Damage Awards

-42-

A.   <u>Defendants' Application</u>

        "[I]n the event the Court does not grant judgment as a matter of law under Rule 50(b), or a new trial under Rule 59, since the jury's award of $3 million in compensatory damages and $2 million in punitive damages are both grossly excessive, remittitur . . . is necessary."  (Defs.' Mem. in Supp. at 20.)

B.   <u>Applicable Law</u>

        The following excerpt from defendants' memorandum of law well synopsizes the law of remittitur:

> A conditional order for remittitur under Rule 59, if granted by the Court, requires a plaintiff to choose between accepting the reduction of a verdict found to be excessive, or of submitting to a new trial.  <u>See</u> <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d 149, 165 (2d Cir. 1998). . . .  Under Federal law, an award will not be disturbed unless it is "so high as to shock the judicial conscience and constitute a denial of justice."  <u>Ismail v. Cohen</u>, 899 F.2d 183, 186 )2d Cir. 1990).  "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages."  <u>Id.</u>  In determining whether the jury reached a "seriously erroneous" result, the district court "is free to weigh the evidence and 'need not view [the evidence] in the light most favorable to the verdict winner.'"  <u>Farrior v. Waterford Bd. of Educ.</u>, 277 F.3d 633, 634 (2d Cir. 2002)(quoting <u>DLC Mgmt. Corp.</u> 163 F.3d at 134). . . .  To determine whether an award is so high as to "shock the judicial conscience," the Court must "'consider[] . . . the amounts awarded in other, comparable cases.'" <u>DiSorbo v. Hoy</u>, 343 F.3d 172, 183 (2d Cir. 2003)(quoting <u>Mathie v. Fries</u>, 121 F.3d 808, 813 (2d Cir. 1997)).  A court should determine whether the award is "within a reasonable range," not just "balance the number of high and low

-43-

> awards and reject the verdict in the instant
> case if the number of lower awards is
> greater." Ismail, 899 F.2d 187.

(Defs.' Mem. in Supp. at 20-22.)

    C.  The Jury's Award of $3,000,000 in Compensatory
        Damages Shocks the Judicial Conscience

    i) Evidence of Economic Loss

No documentary evidence of economic loss was introduced. Plaintiff's oral testimony on the subject, defendants maintain, established no more than $397,434 in economic loss. (Defs.' Reply at 11.) The primary components of that sum are attributable to lost handgun and associated accessory sales during the period plaintiff was prohibited from selling handguns at his Seaford store. Plaintiff testified that the subject period was "about 13 or 14 months." Tr. at 375. Relying on Defendants' Trial Exhibit T, defendants calculations are based on the assumption that the suspension was for thirteen months. Plaintiff's higher counter-calculations totaling $445,605 is based on the belief that the suspension was for fourteen months.

Defendants' Trial Exhibit T is entitled "Reinstatement of New York State Gun Dealers License . . . [to] T&T Gunnery." However, that document is merely an internal police memorandum addressing the subject of reinstatement, as distinct from a communique to plaintiff lifting the suspension as suggested by

-44-

defendants.  (<u>See</u> Defs.' Tr. Ex. T.)  Therefore, the Court concludes that plaintiff's inability to sell handguns and to make related accessory sales was closer to fourteen, than thirteen months, and adopts plaintiff's figures of the economic loss totaling $445,605.[7]

In addition to the $445,605 loss, plaintiff correctly notes that the jury heard his unchallenged testimony that he also sustained damages to the tune of $140,000 brought about by the distress sale from his "personal collection of long arms" made to "help keep the store open."[8]  Tr. at 377.

In sum, the jury could have legitimately concluded based on the evidence at trial that Tretola's economic loss was $585,605, i.e. $445,605 plus $140,000.  <u>See</u> <u>Scala v. Moore McCormack Lines</u>, 985 F.2d 680, 683 (2d Cir. 1993)("In reviewing a claim that the jury awarded excessive damages, we view the evidence and draw all factual inferences in favor of the appellee.")(internal citations and quotation marks omitted).

  ii) Emotional Distress and Other Items of
    <u>Non-Economic Damages</u>

---

[7]  The other four components of loss, to wit, damages to T&T Gunnery's camera and computer systems, its bullet trap, as well as counsel fees expended in defending against the criminal charges, are not materially in dispute.

[8]  That testimony was not challenged either factually as inaccurate at trial, or legally as a non-recoverable item of damages in defendants' post-trial submissions.

In addition to the economic loss of $585,605, plaintiff is entitled to be compensated for "such [other] injuries as impairment of reputation . . . personal humiliation, and mental anguish and suffering."  (Defs.' Mem. in Supp. at 22 (citations and internal quotation marks omitted).  Defendants unconvincingly contend that "Tretola's 'garden variety' emotional damages entitle him to no more than $20,000."  Id.

>          (a)   Plaintiff's Claims and Concomitant
>                Proof in the Record

Plaintiff testified about various non-economic injuries traceable to defendants' conduct including (1) the pain and suffering he experienced from being handcuffed behind his back upon his arrest, Tr. at 357, (2) being deprived of his liberty for somewhere between three and four and a half hours upon being arrested, during which time he was chained to a wall in the precinct, placed in a cell, and then transported to the district court for arraignment, Tr. 357-58, (3) the humiliation of being the focus of negative news coverage on Channels 11 and 12, as well as in Newsday immediately following the May 9th multi-agency raid of the Seaford store and his subsequent arrest,[9] id. at 361-62, (4) being ostracized by many of his prior friends in law enforcement, id. at 362-63, (5) the anger he felt each of the "16

_____

[9]  A Newsday article about his arrest featured a picture of plaintiff in his uniform as a Boy Scout leader; that report understandably "really got to [him]."  Tr. at 361.

-46-

to 18" times, he was required to go to court, id. at 383, on charges he believed to be bogus, id. at 364, (6) his apprehension that the business was "going to fail because people weren't coming in and [because] we got a bad rep," id. at 365,[10] and (7) "feeling like a loser" due to an inability to keep current with his bills, id. at 372.

As a result of these stressors, he had trouble sleeping thus creating the need for proscribed sleeping pills, id. at 364, his "stomach was turning all the time," id. at 372, he was "depressed," id., he was too embarrassed to see his father for a period in apparent contravention of his usual practice, id., he "gained between 60 and 70 pounds," id. at 365, and his demeanor changed — according to the testimony of Robert Sefton ("Sefton"), a retired Chief of Support for the Nassau County Police Department, id. at 244, – from "a happy-go-lucky guy . . . [to a] much more guarded, much more quiet individual [who appeared]

---

[10]  Tretola told the jury that after the events of May 9th and his June 1st arrest the majority of his law enforcement clientele ceased patroning T&T Gunnery, Tr. 362-63, and that the Merrimack and Long Beach Police Departments were no longer his customers.  Id. at 391-92.  He also testified that out-of-state firearm vendors refused to sell him weapons due to his outstanding felony charge, Tr. at 366-67, and that he feared he would lose his right to sell firearms "if [he] had a felony charge [presumably meaning a conviction]."  Tr. at 380.  The latter portion of that testimony – i.e., his belief that he would lose his business in the event of a felony conviction – stands unchallenged.

depressed." Id. at 258-59.[11]

Similar testimony as to the change in plaintiff's personality was given by Hank Brehl ("Brehl"), plaintiff's landlord "since 1978." Tr. at 226. After testifying that the gas heater had been disconnected from an operative gas line in the late 1980s, id. at 229, Brehl described the plaintiff "after the arrest but before the criminal prosecution ended,"[12] id. at 242, as "not [being] his normal self," id. at 236, as appearing "very depressed," id. at 237, and, for the first time, having "problems in paying [his] rent." Id. at 240. Incidentally, that last problem continued up to the date of Brehl's August 8, 2012 testimony. Id.

As to the duration of Tretola's non-economic injuries, it appears that those injuries were mainly limited to the period of almost ten months separating the events of May 9, 2007 and the dismissal of the criminal charges on February 27, 2008. Proof of residual non-economic harm beyond the latter date was not developed during the course of the trial. That said, however, the duration of personal and commercial reputational damage and

---

[11]  It is unclear whether Sefton's description of Tretola's post-arrest demeanor reflected his observations "during the pendency of [the] prosecution" or extended up to the time of Sefton's testimony on August 8, 2012. See Tr. 256-258.

[12]  The dismissal of the reckless endangerment charge occurred on February 27, 2008, thus ending the criminal proceeding. Tr. at 600-01.

associated humiliation is virtually impossible to gauge with any
degree of certainty, but presumably extended beyond the date the
prosecution ended given the broad-based nature of the media
coverage.

(b) Amount Awarded for Non-Economic
    Component of Compensatory Damages
    is Excessive

Given the totality of the evidence presented, the jury
was justified in returning a significant non-economic
compensatory award.  But "significant" means far less than
$2,414,395 (i.e. $3,000,000 - $585,605) for a number of reasons.
Not only were the non-economic items of damages largely limited
to a relatively short span of time, but the subject injuries,
though corroborated by Sefton and Brehl, were presented to the
jury absent any evidence of medical or counseling services being
provided.  While such evidence is not required, it is typically
helpful.  Razzano v. County of Nassau, 2012 WL 1004900, at *5
(E.D.N.Y. Feb. 27, 2012) citing, Carrero v. New York City Hous.
Auth., 890 F.2d 569, 581 (2d Cir. 1989).

Setting an appropriate remittitur amount is a
formidable task because "[u]nlike pecuniary losses, [non-
economic] damages are . . . not easily translated into a dollar
amount." Sulkowska v. City of New York, 129 F. Supp. 2d 274, 308
(S.D.N.Y. 2001)(citations omitted).  Courts in undertaking the
process typically look to awards in similar type cases in

-49-

deciding whether a motion for remittitur has merit, "bearing in mind [, however,] that any given judgment depends on a unique set of facts and circumstances." Scala v. Moore McCormack Lines, 985 F.2d 680, 684 (2d Cir. 1993).

Complicating that approach here is that most of the reported decisions addressing non-economic compensatory awards against members of law enforcement involve not only emotional trauma but physical injury as well.  That being said, the following decisions were, nonetheless, helpful to the Court: Zeno v. Pine Plains Central School District, 702 F.3d 655 (2d Cir. 2012); Meacham v. Knolls Atomic Power Lab., 381 F.3d 56 (2d Cir. 2004) vacated on other grounds sub nom KAPL, Inc. v. Meacham, 544 U.S. 957, 125 S. Ct. 1731, 161 L.Ed.2d 596(2005); Thomas v. Kelly, 903 F. Supp. 2d 237 (S.D.N.Y. 2012); and Wallace v. Suffolk County Police Dep't, 2010 WL 3835882 (E.D.N.Y. Sept. 24, 2010).

In Zeno, the jury in a Title VI Civil Rights action awarded plaintiff $1,250,000 in compensatory damages based on the defendant school district's deliberate indifference to a known pervasive pattern of horrendous racially-based harassment directed at Zeno by his fellow students during three and half years of his high school experience.  As a result, he withdrew from the school minus a diploma.  Following return of the jury's verdict awarding $1,250,000 in compensatory damages, defendant

moved for judgment as a matter of law or, alternatively, for either a new trial or a remittitur of the jury's award.  That application was partially granted, but only to the extent the district court, upon remand, ordered a new trial to be held unless Zeno agreed to accept $1,000,000 for his mental distress claims.  He did so, whereupon judgment was entered.

The school district then appealed, arguing that Zeno's "garden variety" injuries called for remittitur to a far more modest amount than the lower court had granted.  That argument was rejected in toto by the Circuit.

Zeno, of course, is distinguishable from the instant suit.  Not only is it a Title VI, rather than a Section 1983 Civil Rights case, but the Circuit in Zeno opined that, given the severity of harassment, its adverse impact on the boy's future educational and employment opportunities was potentially long term.  In contrast, the harm to Tretola occurred during an approximately ten month span which expired long before trial. Notwithstanding these marked differences, however, Zeno is germane for present purpose because, like here, (1) no medical testimony was provided, (2) no physical injuries were sustained,[13] and (3) proof of the aggrieved party's emotional

---

[13]  Although Zeno "endured [both] threats and physical attacks," Zeno, 702 F.3d at 667, absent from the opinion is any information suggesting that he sustained physical, as distinct from mental injury, as a result.

distress was corroborated by testimony of others, albeit non-professional witnesses.  Yet, the $1,000,000 emotional distress award was found by the Circuit to be within the range of reasonableness.

The plaintiffs in <u>Meacham</u> were former employees who lost their jobs during a reduction in the corporate-defendant's workforce.  Each was over forty at the time of termination.  Suit was commenced under both federal and state anti-age discrimination statutes, with the multiple plaintiffs ultimately receiving favorable jury verdicts.  Defendants' post verdict challenges to the various amounts awarded by the jury "for mental distress damages," were, as explained by the Circuit, resolved at the trial level thusly:

> [I]f the jury had awarded a plaintiff who had not offered evidence of treatment or of physical sequelae[14] more than $125,000 for mental aguish, the court ordered a new trial unless the plaintiff agreed to accept a damages amount of $125,000.  If a plaintiff who had offered proof of treatment or physical impact received more than $175,000 in emotional suffering damages, the court set a remittitur equal to that amount.

<u>Meacham</u>, 381 F.3d at 68.

Tretola, like the first category of plaintiffs in <u>Meacham</u>, did not "offer[] evidence of treatment or of physical

---

[14]  "Physical sequelae" was used to mean something more "than testimony establishing shock, nightmares, sleeplessness, humiliation and other subjective distress."  <u>Meacham</u>, 381 F.3d at 77.

sequelae" attributable to mental distress generated by
defendants' misconduct.  On the other hand, however, a review of
the district court's decision, more particularly, of the
emotional distress injuries sustained by each of the Meacham
plaintiffs discloses that none suffered the type of public
humiliation and reputational damage experienced by Tretola.
Meacham v. Knolls Atomic Power Laboratory, 185 F. Supp. 2d 193,
221-237 (N.D.N.Y. 2002).

        The plaintiff in Thomas v. Kelly brought an action
under 42 U.S.C. § 1983 with attendant state law claims alleging,
inter alia, that he was falsely arrested by several police
officers following the officers' response to a domestic
disturbance call.  Thereafter, as detailed in District Judge
Andrew Carter's decision outlining the evidence placed before the
jury:

> Thomas spent approximately forty-five minutes
> laying chest-down in the snow, handcuffed,
> while police officers physically and verbally
> abused him in front of his girlfriend and
> neighbors.  There was evidence – in the form
> of oral testimony and photographs – that
> during this unlawful restraint, one of the
> police officers held him down by stepping on
> his hair and another by stepping on his legs.
> Thomas testified that one of the officers
> kicked snow in his face and then actually
> kicked him in the face.  As Thomas was being
> dragged away by his hair, he did not know
> where the officers were taking him and
> screamed out Marrow's name "real loud so she
> could see me or know what is going on."
> Thomas testified that he felt "like a piece
> of trash" – "disrespected, violated,

> humiliated [and] embarrassed" – "because I
> never had nothing happen to me like that
> before and everybody around the neighborhood
> knows me as a respectable person."  Then,
> still in view of his girlfriend and
> neighbors, Thomas was placed in a restraint
> jacket, strapped to a stretcher, and put into
> an ambulance.  At the hospital, he was
> sedated despite his protests that he did not
> want to be injected with any needles.  Before
> he lost consciousness, he was "cold, scared,
> nervous, shaking . . . [and] confused," and
> his hand were "hurting and killing" him.

903 F. Supp. 2d at 263-64 (internal cites to transcript omitted.)

Absent from Thomas is an indication that plaintiff received any medical or other professional aid as a result of the emotional or physical assaults to his psyche and person, or that his injuries were other than short term in nature.

Based on the above, Judge Carter denied defendant's motion for remittitur, finding that "the jury's compensatory damages award of $125,000 for false arrest [was] within the wide range of false arrest awards deemed reasonable by other courts in this Circuit,"[15] followed by a supportive list of such other court decisions with a brief synopsis of the relevant portions of their holdings.  Id. at 264.  That listing, as well as Thomas itself, has aided me in deciding the present remittitur motion.

Finally, Thomas's arrest was witnessed by his

---

[15]  The $125,000 compensatory damages award, as explained by Judge Carter, covered both the loss of liberty component of Thomas's claim as well as his emotional and physical distress claims even though the agreed upon verdict sheet, as here, did not separate these items.  Thomas, 903 F. Supp. 2d at 262-63.

girlfriend and neighbors adding to his humiliation.  However, that humiliation pales in comparison to the chagrin almost certainly endured by Tretola when his purported misdeeds were broadcast by the media throughout the bi-county area and beyond.

The defendants in Wallace v. Suffolk County Police Department sought remittitur of the jury's damage awards including $200,000 for emotional distress.  The gravamen of that claim as presented to the jury was that Wallace "was subjected to multiple acts giving rise to retaliation over a period of time by the three highest-ranking officials in the Suffolk County Police Department after speaking out on important matters of public concern.  These Defendants, at times acting in concert, abused their authority over a vulnerable subordinate." Wallace, 2010 WL 3835882, at *9.

As a result, he "suffered, virtually daily from sleepless nights [,] . . . his haired grayed and fell out [, he] became tense, agitated, worried about the personal and professional consequences of Defendants' retaliation, and quick tempered . . . ." Id. at *9.  And, unlike Tretola, Wallace did receive therapy in the form of "attend[ing] monthly sessions of the New York City Police Department's self-support group . . . [and] he and his daughter attended at least fifteen private therapy sessions." Id.  Moreover, the evidence presented – though devoid of "medical records or testimony from medical

professionals," id. at *8 – permitted the inference that plaintiff's "emotional trauma continued even as of the time of the trial." Id. at *9. However, unlike Tretola, "[p]laintiff's claim for emotional distress . . . consist[ed] solely of [his own, i.e., uncorroborated] testimony." Id. at *8.

In sum, defendants' categorization of Tretola's non-economic injuries as "garden variety" is predicated on an almost myopic assessment of the relevant evidence, coupled with a non-recognition of the reasonable inferences that the jury was entitled to draw. That is true not only concerning the media coverage and its likely effect on plaintiff's mental state as discussed above, but also as to other components of his non-economic injury claim.[16] Nonetheless, given that Tretola's emotional injuries were essentially confined to a ten month period, without any treatment by a psychiatrist, psychologist or social worker, and considering other emotional distress awards within the Circuit, the Court concludes that $175,000 is the largest award for plaintiff's non-economic injuries which does not shock the judicial conscience.

For the reasons indicated, the jury's $3,000,000 compensatory damage award is reduced, by the way of remittitur to $760,605 (i.e. $585,605 for economic injury + $175,000 for non-

---

[16] Parenthetically "[g]arden variety emotional distress claims generally merit $30,000 to $125,000 awards." Thorsen v. County of Nassau, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010).

economic injury).

Attention now will be directed to the jury's $2,000,000
punitive damages award.  The question is not whether the jury was
justified in awarding punitive damages for clearly they were.
The viable dispute concerns the amount of that award.

      D.   Jury's $2,000,000 Award for Punitive Damages
          Also Shocks the Judicial Conscience

        i)  Applicable Law

A jury may "assess punitive damages in an action under
§ 1983 when the defendant's conduct is shown to be motivated by
evil motive or intent, or when it involves reckless or callous
indifference to the federally protective rights of others."
DiSorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003)(internal
quotation marks and citation omitted).  The purpose of punitive
damages is "to punish the defendant for his willful or malicious
conduct and to deter others from similar behavior."  Sulkowska,
129 F. Supp. 2d at 309 (quoting Memphis Cmty. School Dist. v.
Stachura, 477 U.S. 299, 307 n.9 (1986).

In BMW of North America v. Gore, 517 U.S. 559, 574-75
(1996), the Supreme Court set forth three guideposts to be
considered when determining whether a punitive damage award is
excessive, to wit (1) the degree of reprehensibility of the
defendant's conduct, (2) the ratio of punitive damages to the
actual or potential harm inflicted on the plaintiff, and (3)
civil and criminal penalties available for comparable

-57-

misconduct.[17]

      ii)   Application of Gore Factors

      a)   Degree of Reprehensibility

"Perhaps the most important indicium of the reasonableness of punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S. at 575. Defendants maintain that Faltings's conduct did not rise to the level of being sufficiently egregious to be deemed motivated by an evil motive or intent. (Defs.' Mem. in Supp. at 29-30.) That argument is irreconcilable, however, with the voluminous evidence that was placed before the jury indicating that the events of May 9th and June 1st 2007 were intended to punish Tretola.

It is beyond legitimate dispute, construing all the evidence most favorably to plaintiff, that the first Gore factor has been satisfied.[18]

---

[17] "Although Gore was a case involving the limits imposed by the Fourteenth Amendment on state courts awarding punitive damages, this Court has recognized that the principles announced in Gore are equally applicable to our review of punitive damages awarded in a federal district court." Patterson v. Balsamico, 440 F.3d 104, 121 n.10 (2d Cir. 2006)(internal quotation marks and citation omitted).

[18] However, it warrants mention that the Supreme Court has noted "that physical assaults generally demonstrate a higher degree of reprehensibility than nonviolent crimes." Patterson, 444 F.3d at 121 (citation omitted). That aggravating factor is, of course, absent here.

b) The Ratio Between the Compensatory
and Punitive Damage Awards

The compensatory and punitive damage awards, as returned by the jury, do not raise disproportionality concerns under Gore.  However, the $3,000,000 compensatory component of the $5,000,000 total award has been pared, subject to remittitur to $760,605.  As a result, the latter figure has been considered in determining the highest amount of punitive damages that is compatible with the Court's judicial conscience viewed through the prism of applicable Second Circuit law regarding appropriate "punitive award[s] against . . . individual police officer[s]." Payne v. Jones, 711 F.3d 85, 105 (2d Cir. 2013).

The relationship between the remittitur amounts for compensatory damages and for punitive damages as established infra is in sync with the second Gore guidepost.

c)  Available Criminal or Civil
Penalties for Like Conduct

Defendants maintain that "[t]here are no New York State civil or criminal penalties for a police officer found liable for civil rights violations for false arrest or malicious prosecution and thus, the third Gore factor is not applicable in this case." (Defs.' Mem. in Supp. at 33.)  Plaintiff challenges the accuracy of that statement, citing Thomas v. Kelly, 903 F. Supp. 2d 237 (S.D.N.Y. 2012) for the proposition that Faltings's conduct could support a prosecution for kidnapping in the second degree under

New York Penal Law § 135.20 which carries a potential penalty of 25 years incarceration.  (Pl.'s Mem. in Opp'n at 34; see also Thomas, 903 F. Supp. 2d at 268).  However, plaintiff's reliance on Thomas for the proposition urged is problematic.  A perusal of that decision strongly suggests that Judge Carter predicated that portion of his analysis on the fact that defendant Kelly arranged to have plaintiff Thomas placed in a psychiatric facility in flagrant disregard of the statutorily established prerequisites for taking such action.  It is not clear to me, however, that the retaliatory arrest and prosecution of Tretola fall within the kidnapping rationale articulated in Thomas.  In essence, then, neither defendants nor plaintiff has assisted the Court as to the third Gore factor.  For that reason, coupled with the fact that the Court is unaware of any germane civil or criminal penalties that could have been imposed for Faltings's misconduct, it is assumed for present purposes that there are none.[19]

---

[19]   The above assumption, while made, is at least debatable. As a long serving veteran of the Nassau County Police Department – whose members have been the subject of punitive damage assessments through the years on numerous occasions – he presumably understood, i.e. had "Notice" for Gore purposes, that certain types of official misconduct could have dire financial consequences.

Parenthetically in Gore, "no criminal sanction whatsoever [was provided] for the subject conduct" and the civil penalty that could have been assessed was "very modest," Payne, 711 F.3d at 104.

> > iii) The Jury's $2,000,000 Punitive Damage
> > Award is Reduced, via Remittitur, to
> > $175,000

It cannot be legitimately disputed that the punitive

damage award returned in this case is grossly excessive.  Indeed,

plaintiff's counsel during summation – who, incidently, was a

forceful and skilled advocate for Tretola – told the jury in

anticipation of the Court's charge on punitive damages:

> [T]hose damages are designed not to
> compensate Marty but to prevent this from
> happening again, to send a message.
>
> You have to determine how much those damages
> should be to carry out that function.  Is it
> millions of dollars?  No it is not.
> Obviously not.

Tr. at 917.

Plaintiff contends in his post-trial submission,

however, that the punitive damages award should not be disturbed,

at least "not to the extent sought by Defendants so as to send a

message to similarly situated municipal officers and the tax

payers who ultimately must foot the bill for the damage award

that conduct similar to Faltings['s] against Tretola simply

cannot be condoned."  (Pl.'s Mem. in Opp'n at 32-33.)  A

juxtapositioning of the purpose of punitive damages with the fact

that Nassau County, not Faltings, will pay the sanction whatever

it may be, lends credence to Tretola's argument.  Unless the

award is sufficiently large to garner the attention of the

officer's supervisors and of the taxpaying public, and to trigger

some type of meaningful response, its impact on the wrongdoer and on others of similar mind-set is likely to be either nonexistent or minimal, thus frustrating the very purpose of making the award in the first place.  However, that argument may not be squared with established Second Circuit law.  In that regard, defendants, after unsuccessfully urging that no punitive damages were warranted, note that the jury's $2,000,000 award dwarfs the maximum amount ever approved by the Second Circuit in a police misconduct case.  In making that argument, defendants understandably place considerable stock in Payne v. Jones, 711 F.3d 85 (2d Cir. 2013).[20]

       The Circuit concluded in Payne that a $300,000 punitive award in an excessive force and battery suit against a defendant police officer was excessive and that any sum over $100,000 could not be sustained.  In doing so, Judge Leval, writing for the panel, explained:

> Our survey [of punitive damage awards in
> comparable cases] shows that we have never
> approved a punitive award against an

---

[20]  At the time the present motion was submitted, the cite for Payne v. Jones was 696 F.3d 189 (2d Cir. 2012).  However, during the pendency of the motion, that opinion was amended by the Circuit via an opinion bearing the same caption with the cite 711 F.3d 85 (2d Cir. 2013).  However, for present purposes, the differences between the two decisions are not germane except to the extent that the revised opinion underscores the need for a heightened degree of judicial readiness to curtail any excessiveness in reviewing such awards.  Accordingly, I will henceforth cite to the 2013 opinion rather than its 2012 predecessor.

> individual police officer as large as the
> $300,000 award here.  We have described
> awards ranging from $125.000 to $175,000 as
> "substantial," <u>King v. Macri</u>, 993 F.2d 294,
> 299 (2d Cir. 1993), and we have ordered
> remittitur of awards as low as $75,000, <u>see
> id.</u> (reducing the award to $50,000); . . . .
> Moreover, in police misconduct cases in which
> we sustained awards around $150,000, <u>see,
> e.g.,</u> <u>Ismail</u> [v. Cohen], 899 F.2d [183,] 187
> [2d Cir. 1990], the wrongs at issue were more
> egregious than the misconduct of Jones.

<u>Payne</u>, 711 F.3d at 105.

The facts in <u>Payne</u> are synopsized in the Circuit

opinion, construing the evidence "in the light most favorable to

<u>Payne</u> [as] the prevailing party," thusly:

> Payne is a decorated Vietnam War veteran who
> suffers from severe post-traumatic stress
> disorder as a result of his military service.
> In the early morning hours of September 11,
> 2007, Payne was taken by his wife and son to
> the emergency room at Faxton-St. Luke's
> Healthcare hospital afer accidentally cutting
> his thumb.  Payne was combative and
> disoriented when he arrived at the emergency
> room.
>
> Because of Payne's combativeness,
> responding officers Brandon Jones and John
> Abel placed him under arrest pursuant to N.Y.
> Mental Hygiene Law § 9.41, which authorizes
> the arrest of a person who appears to be
> mentally ill and acts in a manner likely to
> result in serious harm to himself or others.
> The officers called for an ambulance to
> transport Payne to St. Elizabeth Medical
> Center, the nearby hospital assigned to
> receive people arrested under § 9.41.  While
> a paramedic was examining Payne, Jones
> slapped the side of Payne's head.  After a
> struggle in which Payne resisted the
> officers' efforts to handcuff him and place
> him on a gurney, Payne was loaded into the

ambulance and taken to St. Elizabeth.  Jones
followed the ambulance in his squad car.

At St. Elizabeth, Payne resisted Jones's
efforts to move him from the ambulance gurney
into an individual room in the emergency
room's mental health unit.  Jones wrapped
Payne in a bear hug and pushed him into the
room.  As Jones was placing Payne on the bed,
he noticed Payne's Marine Corps tattoos and
said "Marines are pussies."  In response,
Payne kicked Jones in the groin area.  Jones
reacted by punching Payne in the face and
neck seven to ten times and kneeing him in
the back several times.  Payne, who was still
handcuffed, defended himself by putting his
hands up to cover his face and rolling on the
bed to turn his back toward Jones.  A nurse
rushed forward and grabbed Jones, who then
stopped punching Payne.  The attack lasted 30
seconds or less.  A doctor examined Payne and
found that his face was bloody and swollen,
that his upper back was reddened.  Payne
later testified at trial that the beating
aggravated his existing back pain and his
post traumatic stress disorder.  There was no
evidence of any other injury.

Id. at 88.

It is obvious from Payne that a drastic reduction of

the jury's $2,000,000 punitive damage award must be made.

However, inter-case comparisons of the most important of the Gore

factors, viz. the degree of reprehensibility, are difficult to

draw.  Yet, in my view, Faltings's planned transgressions geared

essentially to destroy Tretola were at least as sanctionable via

a substantial punitive damage award as the dreadful, but

unpremeditated misconduct by the defendant officer in Payne, and

probably, more so.  Accordingly, a punitive damage award in

excess of the $100,000 sustained in <u>Payne</u> would be within the
range of reasonableness.  May the same be said as to a figure in
the neighborhood of $150,000?  As the reader will recall, the
Circuit indicated that it had sustained awards of "around
$150,000," but that in those instances "the wrongs at issue were
more egregious than the misconduct of Jones."  <u>Id.</u> at 105.
<u>Ismail v. Cohen</u>, 899 F.2d 183 (2d Cir. 1990) is referenced by the
Circuit as an example of such cases.

       "In <u>Ismail</u>, a police officer struck the plaintiff in
the back of the head following an argument over a parking
citation written by the officer.  The plaintiff briefly lost
consciousness.  When he awoke, he found that the officer was
pressing a gun against his head and a knee into his back.
Although doctors found that the plaintiff had suffered 'two
displaced vertebrae, a cracked rib and serious head trauma' as a
result of the officer's action, the plaintiff spent more than two
days in jail and was later tried, and acquitted, on three
criminal counts stemming from the parking citation dispute.  The
district court had ruled that the jury's award of $150,000 in
punitive damages was excessive. [The Circuit] disagreed,
reinstating the award." <u>Payne</u>, 711 F.3d at 105 (internal cites
omitted).  Adjusting for inflation, $150,000 in 1990 was the

equivalent of $263,497.32 in 2012.[21]

Finally, the Circuit in Payne, as part of its comparable decisions review discussed DiSorto v. Hoy, 343 F.3d 172 (2d Cir. 2003), categorizating it as the "case most helpful to our analysis." Payne, 711 F.3d at 106. DiSorbo, like here, involved retaliatory police misconduct. The relevant facts as outlined in Payne are as follows:

> The plaintiff was a woman who was arrested by the defendant police officer without just cause in retaliation for having spurned his advances at a bar. At the police station, the defendant slammed the plaintiff into the entry door and then pushed her against a wall, grabbing her throat and choking her. When she tried to defend herself by kicking the defendant, he responded by throwing her to the ground and striking her repeatedly. The attack left bruises on the plaintiff's head, shoulder, and hands, but did not cause any permanent scarring or nerve damage. The jury awarded punitive damages of $1,275 million. We reduced the award to $75,000. It would be impossible to reconcile the $300,000 punitive award against Jones for his less reprehensible conduct with the reduction of the DiSorbo award to $75,000.[22]

Payne, 711 F.3d at 106.

Endeavoring to calibrate hideous behavior for punitive damage comparative purposes is a necessarily challenging and

---

[21]  See U.S. Dep't of Labor, U.S. Bureau of Labor Statistics, CI Inflation Calculator, ht-tp://data.bls.gov/cgi-bin/cpicalc.pl.

[22]  Use of the CI Inflation Calculator, see n.21 supra, indicates that the sum of $75,000 in 2003 equals $93,584.51 as of 2012.

imprecise task.  But although Payne, of course, does not
establish a cap on such awards against police officers, its
holding and rationale cautions against the trier-of-fact, and
reviewing district courts, from having their decisions largely
driven by subjective reactions to troubling conduct rather than
by applicable Second Circuit law.  Faltings's carefully
orchestrated and extended conduct is, in my judgment, within the
same range of egregiousness as that of the officers in Ismail and
DiSorbo.

      In any event, having considered the Gore factors, as
well as awards in comparable cases including those discussed
above, I find that a punitive damages award of $175,000 is the
maximum sum compatible with the judicial conscience.

CONCLUSION

      Defendants' Motion for judgment as matter of law
pursuant to Rule 50(b) is denied.  Their application made under
Rule 59 for a new trial is denied if plaintiff accepts the two
remittitur amounts established above.  Which is to say, unless
plaintiff agrees no later than thirty (30) days from the date of
this Memorandum and Order, in writing, filed electronically with

-67-

the Court and served on defendants, to accept a remittitur of the

compensatory damage award to $760,605 and a remittitur of the

punitive damages award to $175,000, a new trial will be ordered.

      SO ORDERED.

Dated: February 19, 2014
      Central Islip, New York


                                               _____
                                               DENIS R. HURLEY, U.S.D.J.